# United States Court of Appeals for the Federal Circuit

---

**IN RE: THOMAS L. DISTEFANO, III,**
*Appellant*

---

2015-1453

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 10/868,312.

---

Decided: December 17, 2015

---

SCOTT D. PAUL, Cuenot, Forsythe & Kim, LLC, Boca Raton, FL, argued for appellant.

MICHAEL SUMNER FORMAN, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for appellee Michelle K. Lee. Also represented by THOMAS W. KRAUSE, MEREDITH HOPE SCHOENFELD.

---

Before PROST, *Chief Judge,* TARANTO and HUGHES, *Circuit Judges.*

PROST, *Chief Judge.*

Mr. Thomas L. DiStefano, III, appeals the U.S. Patent and Trademark Office, Patent Trial and Appeal Board's ("Board") rejection of claims 24 through 26 of U.S. Patent Application No. 10/868,312 ('312 Application). The Board issued a Decision on Remand on July 16, 2014, and then

issued a Second Decision on Request for Rehearing on December 3, 2014.[1]  The Board's decision affirmed the rejection of claims 24 through 26 under 35 U.S.C. § 102 for anticipation based upon U.S. Patent No. 6,026,433 ("D'Arlach").  In so doing, the Board determined that one of the limitations of independent claim 24 fell within the printed matter doctrine and therefore was not entitled to patentable weight.  This court vacates and remands.[2]

BACKGROUND

Mr. DiStefano's patent application claims a method of designing web pages.  The purported invention is a method that enables an individual to design a web page without requiring them to "learn HTML or to interact extensively with a web page designer."  '312 Application at 3, ll. 12–15.

The application's primary embodiment includes a graphical user interface composed of a primary display screen and an overlaid design plate.  The overlaid design plate is composed of several parts, including menu buttons to assist in editing the website and a design place that can be used to display and edit web assets.  The application describes web assets as including Java applets, scripts, stock art, digital art, background images, textures, etc.  The web assets can come from a web asset database, be uploaded directly by users, or be obtained from independent third party websites.  When the user finishes editing a web asset, the user can drag the web asset from the design plate onto the website.

---

[1]   Pursuant to 37 C.F.R. § 41.52(a)(1) the Board incorporates the holdings of the Decision on Remand in its Second Decision on Remand, except for when the decisions conflict.

[2]   The court does not reach the claim construction dispute regarding dependent claim 25.

There is only one independent claim at issue in this case, claim 24. Claim 24 reads:

A method of designing, by a user in a user interface having first and second display regions each capable of displaying a plurality of element [sic], an electronic document, comprising:

selecting a first element from a database including web assets authored by third party authors and web assets provided to the user interface or outside the user interface by the user;

displaying the first element in the second display region;

interactively displaying the electronic document in the first display region;

modifying the first element displayed in the second display region upon receiving a first command to modify the first element in the second display region; and

displaying the modified first element in the first display region, wherein the modified first element forms at least part of the electronic document.

'312 Application at 19 (emphasis added).

This is not the first time this case has been before us on appeal. We previously held in this case that the Board had not properly designated its anticipation rejection as a new ground of rejection and we therefore remanded this case back to the Board. *In re DiStefano*, 562 F. App'x 984, 984 (Fed. Cir. 2014).

On remand, the Board found that D'Arlach anticipated claims 24 through 26. The Board's analysis focused on claim 24's limitation "selecting a first element from a database including web assets authored by third party authors and web assets provided to the user interface from outside the user interface by the user" (henceforth referred to as the "selecting limitation") as the parties agreed that all of the other limitations were anticipated

by D'Arlach. J.A. 5–12. The Board determined that the selecting limitation should not be afforded patentable weight under the printed matter doctrine. Thus because all the other limitations had been conceded as anticipated by D'Arlach, the Board concluded that claim 24 was invalid as anticipated.[3]

In performing the printed matter analysis, the Board concluded that "web assets' origination from third party authors and the user cannot patentably distinguish (i.e., cannot breathe novelty into) the claimed method, particularly because the web assets' origins have no functional relationship to the claimed method." J.A. 32. That conclusion treats the "origins" as printed matter. *See also* J.A. 33 ("the web assets' origins clearly cannot be functionally related to the claimed method and therefore cannot patentably distinguish the claimed method over D'Arlach"). Moreover, in this court, the Director defends the printed-matter rejection only on the ground that the Board treated the origins, not the web assets themselves as printed matter. Appellee's Br. 19. The Director does not rely on the Board's footnote in its response to a request for rehearing that "[t]he 'printed matter' is analogous to the web assets." J.A. 18 n.11.

Mr. DiStefano now appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

We review the Board's decision in accordance with the Administrative Procedure Act. *Dickinson v. Zurko*, 527 U.S. 150, 165 (1999). We review the Board's factual findings for substantial evidence and the Board's legal

---

[3]    The Board additionally concluded that claims 25 and 26 were also anticipated, but as we ultimately find the Board's anticipation analysis of claim 24 to be in error, we need not discuss the dependent claims.

conclusions de novo. *In re Gartside*, 203 F.3d 1305, 1315–16 (Fed. Cir. 2000). Anticipation is a factual question and thus reviewed for substantial evidence. *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013).

When determining a claim's patentability, the Board must read the claim as a whole, considering each and every claim limitation. *In re Gulack*, 703 F.2d 1381, 1385 (Fed. Cir. 1983). However, we have long held that if a limitation claims (a) printed matter that (b) is not functionally or structurally related to the physical substrate holding the printed matter, it does not lend any patentable weight to the patentability analysis. *Id.* at 1384–85. In performing this analysis we do not strike out the printed matter and analyze a "new" claim, but simply do not give the printed matter any patentable weight: it may not be a basis for distinguishing prior art. As we opined in *In re Gulack*:

> Where the printed matter is not functionally related to the substrate, the printed matter will not distinguish the invention from the prior art in terms of patentability. Although the printed matter must be considered, in that situation it may not be entitled to patentable weight.

*Id.* at 1385 (footnote omitted).

The first step of the printed matter analysis is the determination that the limitation in question is in fact directed toward printed matter. Our past cases establish a necessary condition for falling into the category of printed matter: a limitation is printed matter only if it claims the content of information. *See* 1 Chisum on Patents § 1.02[4] (2015) (printed matter, for giving no weight to "information recorded in any substrate or medium" in comparing prior art and claimed subject matter, is limited to "the content of the information").

The printed matter doctrine dates back to *Ex Parte Abraham*, 1869 C.D. 59 (Comm. Pat. 1869) (finding that coupons with various kinds of stamps and figures are not patentable).[4]   However, the modern rule did not fully develop until 1931 in the case *In re Russell*, 48 F.2d 668, 669 (CCPA 1931).   The claimed invention in *Russell* related to "improvements in indexes particularly to the indexing of names in directories, and is claimed to be applicable to dictionaries, etc." *Id.* at 668.[5] Our predecessor court held that "[t]he mere arrangement of printed matter on a sheet or sheets of paper, in book form or otherwise, does not constitute any new and useful art,

---

[4]   The patent application at issue in this case was described as follows:

> In order to accomplish the object in view, the applicant proposes to employ stamps of various kinds with coupons annexed, to be severed when the stamp is attached to the dutiable article.  The stamps bear figures indicative of the quantity and quality and other peculiarities of the article.  The coupons correspond, and by means of these, and registers of them kept by the government, it is claimed that frauds in evading the tax are prevented.

*Abraham*, 1869 C.D. 59.

[5]   Claim 6 of the patent application is representative and reads:

> A directory comprising a part in which surnames are arranged phonetically with the given names of the respective surnames arranged otherwise than phonetically, and another part in which the surnames are arranged otherwise than phonetically with reference to the section in the first-mentioned part where surnames are arranged phonetically.

*Russell*, 48 F.2d at 668.

machine, manufacture, or composition of matter, or any new and useful improvements thereof . . . ." *Id.* at 669 (internal quotation marks omitted).

Since 1931, both our predecessor court and our court have consistently limited the printed matter rule to matter claimed for its communicative content. After *Russell*, our predecessor court found that "a chart listing the characteristics of real estate in such manner as to expedite real estate assessments"[6] and markings on meat "arranged in a certain manner for the purpose of identifying the meat" were both printed matter.[7] *In re McKee*, 64

---

[6]   Claim 2 of the relevant application is representative and reads:

A valuation chart for buildings comprising a record sheet having details of building constructions arranged in groups designated by classes, each class having listed thereunder the details of building construction frequently found in buildings of that class, and the details being arranged similarly in order in all the classes, whereby when the details of construction of a building to be valued are checked on the record sheet under the nearest approximated classes, the preponderance of checks in any class group will directly indicate the class of buildings to which that particular building belongs and the checks missing in that class group or found in the groups of the other classes will indicate directly the extent to which that building being valued differs from the usual run of buildings of that class.

*In re Reeves*, 62 F.2d 199, 199 (CCPA 1932) (emphasis added).

[7]   Claim 3 of the relevant patent application is representative and reads:

F.2d 379, 379–80 (CCPA 1933).  More recently we concluded that an FDA label providing the dosage instructions for using a medical product was printed matter,[8] that a label instructing a patient to take a drug with food was printed matter,[9] that instructions on how to perform a DNA test were printed matter,[10] and that numbers

---

A principal cut of meat *bearing a series of identifying marks* in relatively close spaced relation and having their longitudinal axes arranged substantially parallel to the planes in which said meat is to be subdivided in forming minor cuts of meat for purchasers.

*McKee*, 64 F.2d at 379 (emphasis added).

[8]     Claim 17 is representative and reads:

A kit for treating a respiratory disease, the kit comprising (a) a budesonide suspension in a sealed container, the suspension containing 0.05 mg to 15 mg budesonide and a solvent, and (b) *a label indicating administration by nebulization in a continuing regimen at a frequency of not more than once per day*.

*AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1048 (Fed. Cir. 2010) (emphasis added).

[9]     *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1279 (Fed. Cir. 2010) (citing claim 21).  Claim 21 depends on claim 17 and is representative.  It reads:

The method of claim 1, further comprising informing the patient that the administration of a therapeutically effective amount of metaxalone in a pharmaceutical composition with food results in an increase in the maximal plasma concentration (Cmax) and extent of absorption (AUC(last)) of metaxalone compared to administration without food.

U.S. Patent 6,407,128.

[10]     Claim 19 is representative and reads:

printed on a wristband were printed matter.[11]   By contrast, we found in *In re Lowry,* 32 F.3d 1579 (Fed. Cir. 1994), that a computer-based structural database was not printed matter, not because it involved a computer, but because the data structures "contain[ed] both information used by application programs and information regarding their physical interrelationships within a memory." *Lowry*, 32 F.3d at 1583–84.[12]

---

A kit for normalizing and amplifying an RNA population, said kit *comprising instructions describing the method of claim 1* and a premeasured portion of a reagent selected from the group consisting of: oligo dT biotinylated primer, T7 RNA polymerase, annealed biotinylated primers, streptavidin beads, polyadenyl transferase, reverse transcriptase, RNase H, DNA pol I, buffers and nucleotides.

*In re Ngai*, 367 F.3d 1336, 1337–38 (Fed. Cir. 2004) (emphasis added).

[11]   Claim 1 is representative and reads:

An educational and recreational mathematical device comprising at least one band which is endless or adapted to have ends thereof fastened to form an endless band and *a plurality of individual digits imprinted on the band* at regularly spaced intervals, *the digits when all read consecutively clockwise as a number constituting a quotient obtained by dividing a number constituted* of . . .

*Gulack*, 703 F.2d at 1383 (emphasis added).

[12]   Claim 1 is representative and reads:

A memory for storing data for access by an application program being executed on a data processing system, comprising:

a *data structure stored in said memory*, said data structure including information resident in a da-

The common thread amongst all of these cases is that printed matter must be matter claimed for what it communicates. Only if the limitation in question is determined to be printed matter does one turn to the question of whether the printed matter nevertheless should be given patentable weight. Printed matter is given such weight if the claimed informational content has a functional or structural relation to the substrate. For example, in *Gulack* we determined that while a sequence of digits printed on a wrist band constituted printed matter, the sequence deserved patentable weight because the informational content of the sequence (what numbers were represented) was functionally related to the endless-band physical structure of the substrate. *Gulack*, 703 F.2d at 1385. Similarly, in *In re Miller*, our predecessor court determined that while the text written on a measuring vessel was printed matter, it must be given patentable weight because there was a "functional relationship between a measuring receptacle, volumetric indicia thereon indicating volume in a certain ratio to actual volume, and a legend indicating the ratio, and in our judgment the appealed claims properly define this relationship." 418 F.2d 1392, 1396 (CCPA 1969). Thus, as we have consistently held, once it is determined that the limitation is directed to printed matter, one must then determine if the matter is functionally or structurally related to the associated physical substrate, and only if the answer is "no" is the printed matter owed no patentable weight.

Here, the Board erred at the threshold step. Although the selected web assets can and likely do communicate some information, the content of the information is not

---

tabase used by said application program and including: . . .
*Lowry*, 32 F.3d at 1581 (emphasis added).

claimed. And where the information came from, its "origin," is not part of the informational content at all. Nothing in the claim calls for origin identification to be inserted into the content of the web asset. Therefore, the Board erred in finding that the origin of the web assets constituted printed matter in the claims at issue and erred in assigning the origin no patentable weight under the printed matter doctrine in finding anticipation by D'Arlach. Thus we vacate the Board's finding that claim 24 was anticipated under 35 U.S.C. § 102. In so doing we also vacate the Board's finding that dependent claims 25 and 26 are anticipated.

CONCLUSION

For the reasons discussed above, we vacate the Board's rejection of claims 24 through 26 under 35 U.S.C. § 102 and remand for further findings.

**VACATED AND REMANDED**

COSTS

Costs awarded to Appellant.